UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KYLE ENDEMANN, <br><br> Plaintiff, <br><br> vs. <br><br> LIBERTY INSURANCE CORPORATION, <br><br> Defendant. | **VERIFIED FIRST AMENDED COMPLAINT** <br><br> Civil Action No. 5:18-CV-0701 (TJM/DEP) |

Plaintiff, Kyle Endemann, by and through his attorneys, Hancock Estabrook, LLP, as and for his First Amended Complaint against the Defendant herein, respectfully alleges as follows:

## THE PARTIES

1.      Plaintiff Kyle Endemann ("Plaintiff") is a resident of the State of New York, County of Madison, residing at 214 Driftwood Drive, Oneida, New York.

2.      Upon information and belief, Defendant Liberty Insurance Corporation ("Defendant") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located at 175 Berkeley Street, Boston, Massachusetts 02117 and is licensed to conduct business in the State of New York.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) insofar as the Plaintiffs and the Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.      Venue is proper in this District pursuant to 28 U.S.C. §1441(a) as this is the District Court of the United States for the district embracing the place where the State Court action was commenced by Plaintiff before Defendant removed the action to this Court, and §1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims

{H3377215.1}

occurred in this District.

## FACTUAL BACKGROUND

5.      Plaintiff owns his home located at 214 Driftwood Dr., Oneida, New York ("the Home").

6.      Defendant sold Plaintiff a LibertyGuard Deluxe Homeowners Policy No. H37-228-506632-40 with a policy period of June 29, 2013 through June 29, 2014 insuring Plaintiff against risk of, among other things, water loss and damage to the Home, subject to certain conditions and exclusions in the Policy.

7.      On or about February 21, 2014, Plaintiff's neighbor Edward Dubois discharged a large quantity of water above ground from his sump pump downhill to the Home, which then entered the Home causing significant water and related damage to the Home and to Plaintiff's contents ("the Loss").

8.      Plaintiff promptly notified Defendant of the Loss and submitted a claim under the Policy for damage to his Home and contents and for all other benefits due to him under the Policy (the "Claim").

9.      On March 3, 2014, his public adjuster Darin Checchia from Basloe, Levin & Cuccaro had a meeting at his home with Defendant's adjuster, Kim Guignard.

10.      Ms. Guignard was made aware prior to this meeting that Plaintiff's neighbor Edward Dubois was the cause of his loss due to the fact that he illegally diverted his sump pump discharge with a mechanical device directly at his house above ground causing a direct physical loss to his basement, garage, patio, yard and foundation.

11.      Directly before this meeting Plaintiff was instructed by Mr. Checchia to have no interaction with Ms. Guignard except to greet her upon her arrival and say goodbye to her when

the meeting had concluded.  Plaintiff did exactly as instructed.

12.     Mr. Checchia and Ms. Guignard met in Plaintiff's basement without him present for approximately five minutes.  After Plaintiff said goodbye to Ms. Guignard, Mr. Checchia handed him a check for $10,500.

13.     It was never communicated to Plaintiff by Defendant that his loss was covered in full under the Policy.

14.     For the sake of expediency rather than justice, Plaintiff later learned that Defendant chose to adjust the claim under the back up of sewer/sump pump overflow and debris removal endorsements of the Policy when the loss clearly exceeded those limits and was covered in full under the Policy up to the policy limits.

15.     Plaintiff received a letter from Defendant dated March 3, 2014 referring to Ms. Guignard's site visit to the Home.  In the letter they referenced that Plaintiff's sump pump failed and requested when and who installed his sump pump along with the invoice of the repaired failed sump pump.  Plaintiff contacted Defendant immediately stating that Plaintiff did not have a sump pump on the date of his loss. (Attached **Exhibit A**)

16.     Prior to a letter Plaintiff authored to Defendant on August 26, 2014 (attached **Exhibit B**), he called his insurance agent to see if they would collaborate with me by subrogating against Adirondack Insurance (Dubois' insurance company) at the same time Plaintiff filed a lawsuit against Dubois so they could get their $10,500 back that they paid me on March 3, 2014. Plaintiff spoke with his agent and was told that Plaintiff needed to speak with a team member from the subrogation department.  When Plaintiff spoke with a team member he was told that there was very little chance that any of the monies would be recouped.  They gave Plaintiff an actual percentage of probability that monies would be awarded as .01%.  Plaintiff took issue with

this as Defendant's subrogation department had never heard the facts of his case or looked at any of his evidence that supported his claim. Plaintiff also stated that he had numerous policies with Defendant and had always been in good standing. Plaintiff was told that Liberty Mutual would spend more money subrogating against the other side with little chance of receiving any monies back in return. At this point Plaintiff asked if he could speak with someone else higher up in the company. The team member gave him the phone number for corporate.

17.     Plaintiff immediately called the telephone number he was given for corporate and was transferred to a President's Service Team representative. Plaintiff was able to state the facts of his case to the representative who then gave him a fax number to send any documentation Plaintiff had to back up these facts. Plaintiff sent them all his information proving that his neighbor was the cause of his loss. The representative stated that the team would take a look at his situation and contact him as soon as they came to a decision.

18.     Plaintiff received a phone call from Defendant approximately a month later stating that they were going to subrogate against Adirondack Insurance on his behalf for his deductible and the monies they paid him.

19.     On October 15, 2014, Plaintiff received a letter from Wayne Frohlich, Esq. from Hennessy & Walker Group, P.C. which stated that he and his firm would be handling the subrogation case for Defendant. Plaintiff received additional letters from Defendant dated June 24, 2015 and October 31, 2016 regarding its efforts in subrogation. (Attached **Exhibit C**)

20.     Defendant was aware of Plaintiff's entire situation from Plaintiff's call to it after receiving its March 4, 2014 letter and now the President's Service Team was aware of his entire situation, including the fact that Plaintiff did not have a sump pump on his date of loss along

with all his documentation to prove the fact that his neighbor was the cause of his damages as of this date.

21.     Prior to June 5, 2017, Plaintiff's then attorney, Galen Haab, was in contact with Defendant on Plaintiff's behalf and had corresponded with Gary Peters in regard to his filing of a new claim and who Plaintiff should contact to do so.  As a result of these conversations, Plaintiff learned that his new adjuster was Tim Thorpe as Kim Guignard was out on disability.  During the contact between Mr. Haab and Mr. Peters all his work product and professional reports were sent to Mr. Peters by Mr. Haab.  However, Mr. Peters stated that he never received them and Plaintiff personally resent them on June 9, 2017 as stated below.  As of this date Plaintiff took over all communication with Defendant.

22.     On June 5, 2017 at 10:15 AM, Plaintiff tried to reach his new claims adjuster Tim Thorpe by phone to file a new claim.  He was not available so Plaintiff contacted Mr. Thorpe's manager Heather Campbell at 10:43 AM.  During this conversation, Plaintiff was informed that Mr. Thorpe was not able to act as his adjuster because Mr. Thorpe's wife is an attorney in Syracuse and there was a conflict of interest.  Plaintiff explained to Ms. Campbell that in 2016 Plaintiff began to notice substantially increased damage to his home.  Plaintiff further explained that he hired several professionals that evaluated, inspected and gave estimates for damage that had begun to show itself in 2016.  These professionals stated without question that all the new damages were directly tied back to his neighbor diverting of his sump pump discharge at his home.

23.     Ms. Campbell then informed Plaintiff that he could not file a new claim because his original claim was for the same date of loss as the new claim Plaintiff was attempting to file *and that his original claim was still open*.  Plaintiff then stated that the Claim was not properly

adjusted.  She responded that his sump pump malfunctioned and that was the only coverage

Plaintiff had that would pertain to his loss.  Plaintiff told her that he did not have a sump pump

on the date of loss.  He told Ms. Campbell that he responded to Ms. Guignard's March 4, 2014

letter and advised Defendant that he had no sump pump on the date of loss, and that Defendant

was made aware of this again in August 2014 when Plaintiff sent all his information to

Defendant's President's Service Team for them to subrogate against his neighbor to recoup the

$10,500 they paid out on the back up of sewer/sump pump overflow endorsement.  Ms.

Campbell then asked Plaintiff if he had drains around his house.  Plaintiff confirmed he did and

she stated that they overflowed and that they paid me out for that.  She again reiterated that

Plaintiff was already paid out by Defendant and that the only coverage he had was the back up of

sewer/sump pump overflow endorsement.  At that point, Plaintiff asked to speak with her

manager.  Plaintiff then reached out to Mike Famiglietti.

      24.     On the same date, June 5, 2017, Plaintiff contacted John Hine in the subrogation

department of Defendant attempting to find out the status of his claim.  This occurred after

Plaintiff spoke with Ms. Campbell.  Mr. Hine stated that he had nothing to do with his claim as

he was only handling the subrogation against Plaintiff's neighbor.  He stated that he sent an

email to Attorney Haab on April 26, 2017 stating that the arbitration was set for August 21, 2017

and that this was the only info he had in his file.  Plaintiff then asked Mr. Hine if he knew Mr.

Peters.  He confirmed that he did and then made reference to his phone call with Ms.

Campbell.  Mr. Hine said that he could see on his computer that Ms. Campbell did escalate his

claim up to her manager Michael Famiglietti and that Plaintiff might want to contact Mr. Peters.

      25.     On or about June 7, 2017, Plaintiff sent letters via email to both Mr. Famiglietti

and Ms. Campbell at 2:41 PM and 3:44 PM respectfully, requesting them to re-examine his

current open and active claim with Defendant from his date of loss on February 21, 2014

(attached **Exhibits D**).  Plaintiff was told by Ms. Campbell that his original claim from his date

of loss was still open and active during their phone conversation on June 5, 2017.

26.     On June 9, 2017 at between 10:49 AM and 11:05 AM all of Plaintiff's

professional reports were emailed to Mr. Peters, Ms. Campbell and Mr. Famiglietti with

acknowledgement of receipt by Ms. Campbell at 11:41 AM (attached **Exhibits E, F, G, H, I, J,**

**K and L**).

27.     On June 12, 2017, Plaintiff received Defendant's first disclaimer of his Claim

(attached **Exhibit M**).  The disclaimer does not cite or identify any Policy conditions, exclusions

and/or limitations, including the limitations period for suing Defendant following a loss.

28.     On June 14, 2017, Plaintiff responded to Defendant's first denial of his valid

claim.  Plaintiff pointed out that they were not in compliance with the Unfair Claim Practices Act

and applicable regulations (New York Insurance Law § 2601 and 11 N.Y.C.R.R. § 216, et seq.),

which clearly provides that Defendant must identify the facts that they relied upon to trigger each

specific exclusion.  It was unclear from Defendant's June 12, 2017 first disclaimer letter whether

they denied that Plaintiff's neighbor's wrongful discharge of his water from his sump pump

caused his damage.  Plaintiff asked them several questions and made numerous statements in his

letter. (Attached **Exhibit N**).

29.     On June 19, 2017, Plaintiff received a second disclaimer letter from Defendant for

his valid claim.  They denied his claim under the surface water exclusion and the settlement

exclusion even though they confirmed that his direct physical loss was due to his neighbor's

negligence (attached **Exhibit O**).  This supplemental disclaimer does not cite or identify any

Policy conditions or limitations, including the limitations period for suing Defendant following a loss, as grounds for the disclaimer.

30.     After June 19, 2017, Plaintiff spoke with Ms. Campbell and Mr. Famiglietti by telephone in which Plaintiff clearly stated the facts of how they misinterpreted their own Policy and thus mis-adjusted his claim.  Plaintiff then communicated to both all the following reasons how they egregiously mishandled his claim: (a) Defendant never did an investigation on his behalf; (b) Defendant sent an adjuster, who had met at his house with his public adjuster for all of approximately five minutes all the while knowing that his neighbor's sump pump diversion was the cause of his flooding, decided to cover the claim under the back up of sewer/sump pump overflow and debris removal endorsements notwithstanding the fact that on the date of loss Plaintiff had no sump pump; (c) when Defendant paid Plaintiff under these endorsements Defendant never communicated to Plaintiff that he had other remedies available under the policy; (d) in Defendant's first disclaimer dated June 12, 2017, they did not comply with the Unfair Claim Practices Act, which clearly states that they must clearly identify the facts that they relied upon to trigger each specific exclusion; instead they simply sent me a copy of the Policy; (e) in Defendant's second disclaimer letter dated June 19, 2017: (i) Defendant clearly misinterpreted their own policy coverage, thus breaching the contract by denying coverage under the surface water exclusion. Coverage was provided under Section I: "Direct Loss to Property … only if that loss is a physical loss to property."  Section I Coverage is subject to Section I Exclusions, including the Water Damage Exclusion (Exclusion c), but that Exclusion does not apply.  It was not subsurface water under subpart (3), and it is not excluded by the surface water exclusion, subpart (1), which applies only to water overflow caused by an event of nature as the language of the Policy and case law clearly state.  The water flow in this case resulted from a

man-made event (my neighbor's mechanical device – sump pump) and not an event of nature (Act of God); (ii) Defendant had not properly evaluated the coverage and had been misleading in its coverage analysis.  Plaintiff provided Defendant with all his work product, expert engineering reports and professional reports.  Defendant instead of fairly and impartially reviewing the evidence, denied the claim in a letter dated Monday, June 19, 2017 that simply cited the water damage exclusion without any effort to identify the facts which triggered each specific exclusion as clearly required by NY Insurance Law.  There is no accord and satisfaction since no money was paid under the policy.  All money was paid under the additional coverage provided by the endorsements; (iii) all damage to Plaintiff's home due to erosion/settlement should have been covered because Defendant did not follow the direct chain of causation that occurred directly from Plaintiff's neighbor's negligent and illegal act of diverting his water directly at his house causing direct physical damage.  All settlement damage was caused by a man-made device not an act of nature/God; and (iv) when Defendant subrogated against Adirondack they did not reach out to Plaintiff or consult him in the process or include him in the arbitration of the subrogation claim.

31.     Therefore, Defendant never denied Plaintiff's Claim until its disclaimer letter dated June 12, 2017.

32.     Under New York law once Defendant issued its June 12, 2017 disclaimer letter it was prohibited, waived, and was estopped to assert any further policy conditions or exclusions as grounds for disclaimer of coverage to Plaintiff, including the statute of limitations for suing for a loss under the Policy.

33.     Defendant did not specifically identify any Policy Exclusions or conditions, including the limitations period for suing under the Policy after a loss, in its June 12, 2017

disclaimer and therefore was prohibited and estopped and waived any Policy exclusions and conditions under the Policy its June 19, 2018 supplemental disclaimer.

34.     Defendant's belated disclaimer of coverage was untimely, improper, unjustified, and constitutes bad faith.  The bad faith of Defendant was not just an arguable difference of opinion between Defendant and Plaintiff over coverage, but was such bad faith in denying coverage that no reasonable insurer would, under the given facts, be expected to assert it.

35.     Defendant's provision requiring suit within two years of the date of the loss is unreasonable given its failure to address and either accept or deny the Claim until June 12, 2017, well after the expiration of the two-year limitations period, under New York law pursuant to *Executive Plaza, LLC v. Peerless Ins. Co.*, 22 N.Y.3d 511 (2014) and additional authority.

36.     Upon information and belief, Defendant improperly denied Plaintiff's Claim for the purposes of placing its own pecuniary interests ahead of those of Plaintiff, its policyholders, and for withholding from Plaintiff the rights and benefits to which he is entitled under the Policy.

37.     Due to Defendant's wrongful and bad faith denial of coverage and failure to pay the benefits due Plaintiff under the Policy, the damage to the Home has significantly worsened.

38.     Plaintiff has incurred and continues to incur substantial extra expenses as a result of the Loss and as a result of Defendant's improper refusal to pay the amounts due under the Policy to restore the Home to its pre-loss condition.

39.     The damage to Plaintiff's Home and contents as well as his unreimbursed past and continuing additional living expenses fall within the coverage of the Policy.

40.     All premiums due and owing in connection with the Policy have been paid.

41.     All applicable conditions of the Policy have been complied with, including notice and cooperation.

42.     Despite Plaintiff's full cooperation with Defendant, and their entitlement to full coverage under the Policy, to date Defendant has not paid the full covered Loss.

43.     Defendant has refused in bad faith to pay amounts that it knows to be owing under the Policy for no legitimate reason, and for the improper purpose of depriving Plaintiff of the coverage for which he paid.

44.     Plaintiff has and continues to incur additional expenses, including but not limited to attorneys' fees and expenses, in commencing and prosecuting this action as a result of Defendant's breach of contract.

45.     Under established New York law reasonably foreseeable consequential damages are recoverable for an insurer's breach of the duty to provide coverage to its insured.

46.     Under established New York law an insured's additional expenses, including but not limited to attorneys' fees incurred in pursuing coverage, may constitute such consequential damages and be recoverable.

47.     Plaintiff and Defendant knew or reasonably foresaw when the Policy was issued that if Defendant disclaimed coverage for a covered loss Plaintiff would incur substantial additional expenses, including but not limited to attorneys' fees in suing to obtain coverage.

48.     Accordingly, Plaintiff is entitled to recover his additional expenses, including but not limited to its attorneys' fees and expenses incurred in bringing this action, as they were reasonably foreseeable at the time the Policy was issued.


**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

49.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 48 as if fully set forth here.

50.     Defendant has failed and refused to provide coverage to Plaintiff for his Loss, which is covered under the Policy.

51.     By reason of the foregoing, an actual and justiciable controversy exists between Plaintiff and Defendant regarding Defendant's obligations to provide coverage to Plaintiff for their Loss.

52.     Plaintiff is entitled to a judicial declaration from this Court that: (a) Defendant is obligated to perform its contractual obligations under the Policy, and (b) that Plaintiff is entitled to coverage for the full amount of his Loss.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

53.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 52 as if fully set forth here.

54.     Defendant has breached its obligations under the Policy by failing and refusing to pay the full amount of Plaintiff's covered Loss.

55.     By reason of Defendant's breach, Plaintiff has been deprived of the benefits due and owing under the Policy.

56.     Plaintiff is entitled to an award of compensatory damages, consequential damages, pre- and post-judgment interest, attorneys' fees and costs in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### (Violation of the Duty of Good Faith and Fair Dealing)

57.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 31 as if fully set forth herein.

58.     Defendant is required to act in good faith, abstain from deception, and practice honesty and equity in all dealings with its policyholders, including Plaintiff, under the insurance policies it sells.

59.     The business of insurance always affects the public interest.

60.     Defendant owes a covenant of good faith and fair dealing to Plaintiff in light of the insurance relationship created by the Policy.

61.     The covenant of good faith and fair dealing obligates each party to the contract to refrain from taking any action that would deprive the other of the benefits of the contract, or to cause undue hardship or harm to the other party.

62.     Defendant's conduct constitutes bad faith.

63.     Specifically, Defendant acted in bad faith with respect to Plaintiff by and through its unreasonable, malicious, reckless, or intentional failure and refusal to pay Plaintiff the benefits to which they are entitled under the Policy when no other reasonable insurer would have denied coverage.

64.     In violation of its duties to Plaintiff, Defendant acted in bad faith by: (A) unreasonably, maliciously, recklessly, or intentionally denying its obligations to pay benefits to Plaintiff when it knew or should have known it had an obligation to provide insurance coverage; (B) failing and refusing to pay the Loss without a reasonable basis and with the knowledge or reckless disregard of its lack of reasonable basis; (C) unreasonably, maliciously, recklessly, or intentionally delaying payment of the insurance proceeds due and owed Plaintiff

under the Policy; (D) failing to conduct a fair, complete and proper investigation of Plaintiff's claim before denying coverage; (E) breaching its promise of security to Plaintiff by unreasonably and without justification reneging on the homeowners insurance benefits it promised to provide Plaintiff, leaving Plaintiff without sufficient resources to repair his damaged Home; and (F) otherwise acting intentionally, maliciously, unreasonably, or recklessly in denying the Plaintiffs the benefits owed under the Policy.

65.     The entire array of bad faith actions and omissions on the part of Defendant set forth in the preceding paragraph is the type of egregious disregard for the obligations specified by the standard form Policy and the rights entitled to all insureds under Liberty's standard form homeowner insurance policies as to require the imposition of consequential damages.

66.     Upon information and belief, Defendant's bad faith conduct described above was engaged in for the purposes of placing its own pecuniary interests ahead of those of Plaintiff, its policyholders, and for withholding from Plaintiff the rights and benefits to which they are entitled under the Policy.

67.     As a result of Defendant's bad faith breach of its obligations under the Policy, Plaintiff has suffered, and will continue to suffer, substantial damages in an amount to proven at trial.

68.     As a result, Plaintiffs are entitled to an award of compensatory damages, consequential damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**(Violation of N.Y. Gen. Bus. Law § 349)**

69.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 68 as if fully set forth herein.

70.     Defendant and its agents, servants, and employees are governed by New York Insurance Law § 2601 and regulations promulgated under such statute set forth in 11 N.Y.C.R.R. § 216, et seq. prohibiting unfair claim settlement practices.

71.     In addition, Defendant and its agents, servants and employees are prohibited from engaging in deceptive acts and practices pursuant to New York General Business Law § 349.

72.     The New York Insurance Law prohibits and/or requires certain action by insurance companies, their agents and representatives and conduct by insurance companies, their agents and representatives who by deviating from the following rules of play are deemed to have engaged in unfair claim settlement practices enumerated under New York Insurance Law § 2601: (1) knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue; (2) failing to acknowledge with reasonable promptness pertinent communications as to claims arising under its policies; (3) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies; (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear, except where there is a reasonable basis supported by specific information available for review by the department that the claimant has caused the loss to occur by arson. After receiving a properly executed proof of loss, the [insurance company] shall advise the claimant of acceptance or denial of the claim within thirty working days; (5) compelling policyholders to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them.

73.     New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce in the furnishing of any service in the State of New York and makes such acts and practices unlawful.

74.     Defendant, through its agents, servants, and employees engaged in deceptive acts and practices in violation of New York General Business Law § 349 by engaging in the activities described above.

75.     Plaintiff is an individual consumer.

76.     The Policy is a consumer-oriented standard form product that is designed and intended by Defendant to be purchased by the public at large in the State of New York.

77.     The forms making up the Policy are consumer-oriented in that they are offered and are available to consumers at large, and are regularly used by Defendant in the inducement of individual consumers in the market for homeowners' insurance coverage.

77.     Plaintiff and Defendant occupy disparate bargaining positions.

78.     Upon information and belief, Defendant engaged in a recurring pattern of selling standard homeowners insurance policies, without warning said consumers that Defendant regularly and routinely fails to live up to the promises to provide insurance coverage as set forth in such policies and fails to observe fair and reasonable claim adjustment practices and procedures, engaging in the above described bad faith and unfair claims settlement practices.

79.     Upon information and belief, when confronted with a policyholder's significant loss claim, Defendant regularly and routinely engages in the practice of avoiding or inordinately delaying the settlement of the claim in violation of New York Insurance Law § 2601 and the regulatory support scheme for this law.

80.     Defendant's practices, as described, harm the public at large in a material way by misleading the public at large to rely upon advertisements, promotions, and products sold by Defendant when purchasing insurance coverage and by thwarting and frustrating the claims adjustment process with the intent and purpose of discouraging consumers of Defendant's insurance products from pursuing legitimate claims under policies sold by Defendant.

81.     Defendant's actions not only have caused injury to Plaintiff, but, upon information and belief, have caused injury to numerous other similarly situated consumers and policyholders.

82.     Plaintiff has been injured and damaged as a direct and proximate result of Defendant's deceptive and misleading acts and unfair claim settlement practices prohibited under New York law.

83.     Plaintiff acted and relied in a reasonable manner upon Defendant's practices of advertising, promoting and selling homeowners' insurance coverage when they purchased the Policy.

84.     By reason of the foregoing, Plaintiff is entitled to recover all of his damages from Defendant, including actual damages, consequential damages, treble damages, attorneys' fees and costs.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A.     Declaratory judgment favor of Plaintiff and against Defendant, including a declaration that Plaintiff is entitled to coverage for the full amount of the Loss at the Home;

B.     An award of damages in favor of Plaintiff and against Defendant in an amount to be determined in this action, including compensatory damages, consequential damages, pre- and post-judgment interest, attorneys' fees, and treble damages;

C.    The costs and disbursements of this action; and

D.    Such other and further relief as the Court may deem just and proper under all the

circumstances, including, but not limited to, Plaintiffs' costs and disbursements in this action.

Dated:  July 11, 2018                          *Attorneys for Plaintiff*
                                               HANCOCK ESTABROOK, LLP

                                               Alan J. Pierce, Esq.
                                               100 Madison St., Suite 1500
                                               Syracuse, New York 13203
                                               Tel: (315) 565-4500

## VERIFICATION

STATE OF NEW YORK    )
COUNTY OF MADISON  ) ss.:

        The undersigned, being duly sworn, deposes and states that:

        I am the Plaintiff in the above action; I have read the foregoing Verified First
Amended Complaint and know the contents thereof; the same is true to my own
knowledge, except as to matters therein stated to be alleged upon information and belief,
and as to those matters I believe them to be true.

                                               Kyle Endemann

Sworn to before me this
11th day of July, 2018

Notary Public

ALAN J. PIERCE
Notary Public in the State of New York
Qualified in Onon. Co. No. 02PI5035719
My Commission Expires 11-7-18